*UNITED STATES DISTRICT COURT*
*DISTRICT OF MAINE*

| | | |
|---|---|---|
| *GORDON T. JAMES,* | ) | |
| | ) | |
| *Third-Party Plaintiff* | ) | |
| | ) | |
| *v.* | ) | *No. 2:09-cv-84-JHR* |
| | ) | |
| *GMAC MORTGAGE LLC   and* | ) | |
| | ) | |
| *QUICKEN LOANS INC.,* | ) | |
| | ) | |
| *Third-Party Defendants* | ) | |
| _____ | ) | |
| | | |
| *GORDON T. JAMES,* | ) | |
| | ) | |
| *Counterclaimant* | ) | |
| | ) | |
| *v.* | ) | |
| | ) | |
| *U.S. BANK NATIONAL ASSOCIATION* | ) | |
| *as Trustee for BAFC 2006-1,* | ) | |
| | ) | |
| *Counterclaim Defendant* | ) | |

*MEMORANDUM DECISION ON MOTIONS FOR LEAVE TO AMEND, TO STAY, AND FOR SUMMARY JUDGMENT*

The third-party plaintiff and counterclaimant, Gordon T. James, moves for leave to amend his answer to add a statutory affirmative defense (Docket No. 122). Third-party defendant GMAC Mortgage LLC ("GMAC") and the former plaintiff, now counterclaim-defendant, U.S. Bank National Association ("USB") move for a stay and to substitute an exhibit (Docket No. 150). GMAC moves for summary judgment on the claims asserted against it (Docket No. 89). Third-party defendant Quicken Loans Inc. ("Quicken") moves for summary

judgment on the claims asserted against it, and USB moves for summary judgment on James's counterclaims (Docket No. 95).  I grant the motions for summary judgment in part.  The motions to amend, to substitute, and for a stay have been withdrawn or are moot.

### I.  Motion for Leave to Amend

James's motion for leave to amend his answer to add an affirmative defense under 11 M.R.S.A. § 3-1308(1) is moot, as I have granted USB's motion to dismiss its complaint, to which this defense would have been asserted.  Docket No. 189.

### II.  Motion for a Stay

USB and GMAC moved for a stay in ruling on their motion for summary judgment. Plaintiff's and GMAC's Motion to Stay Ruling on Plaintiff's and GMAC's Motion for Summary Judgment and to Substitute Exhibit ("Stay Motion") (Docket No. 150) at 1.  They also sought to substitute what they characterize as the original note that gave rise to this foreclosure action for an exhibit that was purported to be the original note at the time the motion for summary judgment was filed.  *Id*. at 2-3.  The motion for stay would allow for additional discovery related to this newly-discovered document, which James also seeks in a motion for relief (Docket No. 151) that is not addressed in this memorandum decision.

However, USB and GMAC have withdrawn their motion to stay.  Plaintiff and GMAC's Reply to Plaintiff and GMAC's Motion to Stay Ruling on Plaintiff and GMAC's Motion for Summary Judgment (Docket No. 164) at 1.  They apparently have withdrawn the request to substitute the "new" note.  *Id*.  Accordingly, this motion is moot.

### III. Motions for Summary Judgment

### A. USB and GMAC

### 1. Summary Judgment Standard

### a. *Federal Rule of Civil Procedure 56*

Summary judgment is appropriate only if the record shows "that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); *Santoni v. Potter*, 369 F.3d 594, 598 (1st Cir. 2004). "A dispute is genuine if the evidence about the fact is such that a reasonable jury could resolve the point in the favor of the non-moving party." *Rodríguez-Rivera v. Federico Trilla Reg'l Hosp. of Carolina*, 532 F.3d 28, 30 (1st Cir. 2008) (quoting *Thompson v. Coca-Cola Co.*, 522 F.3d 168, 175 (1st Cir. 2008)). "A fact is material if it has the potential of determining the outcome of the litigation." *Id.* (quoting *Maymi v. P.R. Ports Auth.*, 515 F.3d 20, 25 (1st Cir. 2008)).

The party moving for summary judgment must demonstrate an absence of evidence to support the nonmoving party's case. *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). In determining whether this burden is met, the court must view the record in the light most favorable to the nonmoving party and give that party the benefit of all reasonable inferences in its favor. *Santoni,* 369 F.3d at 598. Once the moving party has made a preliminary showing that no genuine issue of material fact exists, the nonmovant must "produce specific facts, in suitable evidentiary form, to establish the presence of a trialworthy issue." *Triangle Trading Co. v. Robroy Indus., Inc.*, 200 F.3d 1, 2 (1st Cir. 1999) (citation and internal punctuation omitted); Fed. R. Civ. P. 56(e). "As to any essential factual element of its claim on which the nonmovant would bear the burden of proof at trial, its failure to come forward with sufficient evidence to generate a trialworthy issue warrants summary judgment to the moving party." *In re Spigel*, 260

F.3d 27, 31 (1st Cir. 2001) (citation and internal punctuation omitted).

### b. Local Rule 56

The evidence that the court may consider in deciding whether genuine issues of material fact exist for purposes of summary judgment is circumscribed by the local rules of this district. *See* Loc. R. 56. The moving party must first file a statement of material facts that it claims are not in dispute. *See* Loc. R. 56(b). Each fact must be set forth in a numbered paragraph and supported by a specific record citation. *See id.* The nonmoving party must then submit a responsive "separate, short, and concise" statement of material facts in which it must "admit, deny or qualify the facts by reference to each numbered paragraph of the moving party's statement of material facts[.]" Loc. R. 56(c). The nonmovant likewise must support each denial or qualification with an appropriate record citation. *See id.* The nonmoving party may also submit its own additional statement of material facts that it contends are not in dispute, each supported by a specific record citation. *See id.* The movant then must respond to the nonmoving party's statement of additional facts, if any, by way of a reply statement of material facts in which it must "admit, deny or qualify such additional facts by reference to the numbered paragraphs" of the nonmovant's statement. *See* Loc. R. 56(d). Again, each denial or qualification must be supported by an appropriate record citation. *See id.*

Failure to comply with Local Rule 56 can result in serious consequences. "Facts contained in a supporting or opposing statement of material facts, if supported by record citations as required by this rule, shall be deemed admitted unless properly controverted." Loc. R. 56(f). In addition, "[t]he court may disregard any statement of fact not supported by a specific citation to record material properly considered on summary judgment" and has "no independent duty to search or consider any part of the record not specifically referenced in the parties' separate

4

statements of fact." *Id.*; *see also, e.g., Sánchez-Figueroa v. Banco Popular de P.R.*, 527 F.3d 209, 213-14 (1st Cir. 2008).

## 2. Factual Background

The statements of material facts submitted by the parties in accordance with this court's Local Rule 56 include the following undisputed issues of material fact.

On or about June 30, 2005, James executed and delivered to Quicken a fixed rate note (the "Note"). Statement of Material Facts in Support of Motion for Summary Judgment ("USB SMF") (Docket No. 90) ¶ 1; Defendant[']s Responses to Statements of Facts and Additional Facts in Opposition to Motions of Plaintiff, GMAC Mortgage, and Quicken for Summary Judgment ("James Responsive SMF") (Docket No. 124) ¶ U/G 1.[1]  He also executed and delivered to Quicken a mortgage, also dated June 30, 2005, that was recorded in the York County Registry of Deeds in Book 14533, Page 740 (the "Mortgage"). *Id.* ¶ U/G 2.  Mortgage Electronic Registration Systems, Inc., acting solely as a nominee for Quicken, the beneficiary of this mortgage, assigned the Mortgage to US Bank. *Id.* ¶ U/G 5.  USB is in possession of the Mortgage and has been at all times relevant to the claims in this action. *Id.* ¶ U/G 6.

At the outset, the Note required James to make monthly payments of $948.75. *Id.* ¶ U/G 10.  The payment schedule on the Truth In Lending Act ("TILA") disclosure prepared by Quicken for the loan listed 120 payments of $1,029.83 that each consisted of $948.75 in interest

[1] James filed a single document responding to the two statements of material facts filed in support of the two motions for summary judgment, one from USB and GMAC and one from Quicken.  He identifies his responses to the summary judgment motions originally filed by USB and GMAC with the designation "U/G" followed by the paragraph number, and his responses to Quicken's motion for summary judgment with the designation "Q" followed by the paragraph number.  James moves to strike paragraph 1 of the statement of material facts filed by USB and GMAC, the first of 53 such motions in his responsive statement of material facts, on the ground that the authority cited in support of the paragraph, the affidavit of Jeffrey Stephan, dated April 23, 2010, is vitiated by the fact that USB and GMAC entered into a written stipulation at some unspecified time "stating that they had produced all documents relating to the loan that is the subject of this action" and that a certain "note endorsement" was not among them.  James Responsive SMF ¶ U/G 1(c).  That "note endorsement" is also the basis of James's two other stated bases for his motion to strike.  Because the substance of this paragraph of the statement of material facts filed by USB and GMAC does not refer to any such endorsement, the motion is denied and the paragraph is deemed admitted.

and $81.08 in mortgage insurance and 51 payments of $1,458.43 that each included principal and interest of $1,423.93 and $34.50 in mortgage insurance. Defendant's Statement of Additional Material Facts ("James SMF") (included in James Responsive SMF, beginning at 48) ¶ J2; US Bank and GMAC's Reply Statement of Material Facts ("USB Responsive SMF") (included in US Bank and GMAC's Opposition to Defendant's Motions to Strike (Docket No. 132)) ¶ J2. The Personal Mortgage Insurance ("PMI") notice for the loan provided that PMI would terminate automatically when the principal balance of the loan was scheduled to reach 78% of the original value of the property. *Id.* ¶ J3. A total of 360 payments were due under the Note. *Id.* ¶ J4.

Quicken required James to pay for mortgage insurance. *Id.* ¶ J6. On its TILA disclosure, Quicken disclosed 189 payments in the amount of $1,423.93 that did not include mortgage insurance. *Id.* ¶ J7. The Good Faith Estimate prepared by Quicken revealed a monthly payment of $1,243.22, which included taxes and hazard insurance, but no mortgage insurance. *Id.* ¶ J14. The sum of all payments disclosed in the payment schedule on the TILA disclosure is $467,082.30. *Id.* ¶ J20. The mortgage required an escrow account into which James would make monthly payments for real estate taxes and insurance which the lender would use to make the payments. *Id.* ¶ J43. Quicken set up the escrow account for this loan. *Id.* ¶ J44.

Quicken used a billing statement from the Concord Group that covered the period from May 30, 2005, to August 30, 2005, as proof of insurance to calculate the monthly escrow payments for homeowner's insurance at the origination of James's loan. *Id.* ¶ J25. Quicken required a copy of the homeowner's insurance policy as proof of homeowner's insurance to close a loan. *Id.* ¶ J26. Quicken miscalculated and understated to James the amount due each month for homeowner's insurance. *Id.* ¶ J32. With a payment of $43 per month for homeowner's

insurance due to the escrow account, according to the Note and disclosures provided by Quicken, James's monthly payment would have been $1,307.89. *Id.* ¶ J34.

A default of the Note is also a default of the Mortgage. USB SMF ¶ 12; James Responsive SMF ¶ U/G12. James received notice of default. *Id.* ¶ 16. The notice of default states, "[i]f funds tendered are not honored for any reason, the default will not be cured." *Id.* ¶ 36. In February 2008, GMAC communicated to James that, if he sent in a check for $5,405.00 by March 3, 2008, he could cure the default alleged by GMAC. James SMF ¶ J36; USB Responsive SMF ¶ J36. James obtained a check for $5,405.00 from Biddeford Savings Bank, dated February 22, 2008. *Id.* ¶ J37.

GMAC received the Biddeford Savings Bank check in February 2008. *Id.* ¶ J38. GMAC rejected the check. *Id.* ¶ J40. GMAC talked to James on March 12, 2008, and he indicated that he had sent in a check and the check had been returned. *Id.* ¶ J42(e). USB approved the loan for foreclosure on March 15, 2008. *Id.* ¶ J24.

When Quicken transferred the loan to GMAC on or around July 20, 2005, it delivered the billing notice as proof of insurance. *Id.* ¶ J46. Quicken listed an incorrect address for the Concord Group on its notice of transfer of the loan. *Id.* ¶ J47. Quicken did not provide proof of coverage of the insurance policy after August 30, 2005, to GMAC. *Id.* ¶ J48. James contacted GMAC on November 4, 2005, regarding his insurance policy. *Id.* ¶ J49.

GMAC placed insurance on the property for the period of July 29, 2005, to July 29, 2006, with its carrier, Balboa Insurance, at an annual premium of $2,120.00, which was advanced from James's escrow account. *Id.* ¶ J52. It did so again for the period from July 28, 2006, to July 29, 2007, at an annual premium of $1,759.00 advanced form James's escrow account. *Id.* ¶ J53. GMAC placed insurance on the property with a coverage amount of $1,000,000.00 and an

annual premium of $8,500 charged to James's escrow account, effective November 25, 2006, to November 26, 2007, and again for the period from November 25, 2007, to 2008. *Id.* ¶ J55. GMAC stated that the coverage amount was based on the last known amount of coverage James purchased or the principal balance of the loan. *Id.* ¶ J56.

James contacted GMAC on October 26, 2006, November 28, 2006, December 5, 2006, and March 12, 2008, regarding his homeowner's insurance and escrow account. *Id.* ¶ J58. In March and April 2008, James's insurance agent sent proof of homeowner's coverage to GMAC dating back to July 29, 2005, through June 4, 2008, which GMAC accepted. *Id.* ¶ J59.

GMAC is not a party to the Mortgage. USB SMF ¶ 90; James Responsive SMF ¶ U/G90.

### 3. Discussion

Remaining for consideration with respect to this motion for summary judgment are the following counterclaims asserted against USB: breach of contract (Count I), violation of the Maine Consumer Credit Code and the federal Truth in Lending Act (Counts II & III), violation of the federal Real Estate Settlement Procedures Act (Count III), violation of the Maine Unfair Trade Practices Act (Count IV), and infliction of emotional distress (Count V). Defendant's First Amended Answer, Affirmative Defenses, Counterclaims and Third Party Complaint to Plaintiff's First Amended Complaint ("Counterclaim") (Docket No. 66) at 6-23. All of these claims are asserted against GMAC as well. *Id.*

### a. Count I

Count I of the counterclaim and third-party complaint alleges that GMAC "as servicer and agent for US Bank," to which Quicken had "allegedly assigned" the loan, breached the "Mortgage Contract" by rejecting James's payment of the amount it demanded to correct his default. Counterclaim ¶¶ 59-67. GMAC argues that it is entitled to summary judgment on this

count because it was not a party to any mortgage contract with James. Plaintiff's and Third Party Defendant GMAC Mortgage, LLC's Motion for Summary Judgment Pursuant to F.R.C.P. 56 ("USB Motion") (Docket No. 89) at 7.

James does not respond to this argument, discussing only USB's alleged breach of contract. Defendant's Memorandum in Opposition to Motion for Summary Judgment of Plaintiff and Third Party Defendant GMAC Mortgage, LLC ("Opposition") (Docket No. 123) at 17-23.[2]

An agent is not personally liable for breach of a contract to which its principal is a party so long as the identity of the principal is disclosed. *K & S Servs., Inc. v. Schulz Elec. Group of Cos.*, 670 F.Supp.2d 91, 94 (D. Me. 2009). From all that appears in the summary judgment record, that is the case alleged here with respect to GMAC. GMAC accordingly is entitled to summary judgment on Count I.

USB contends that it is entitled to summary judgment because, on the only ground alleged for this claim, James's attempted cure payment "was improper and untimely." USB Motion at 8-10. Essentially, USB asserts that this is so because James's first attempt to cure, while it may have been timely, was not made in a manner that would allow for it to be credited to his loan account. *Id*. There appears to be agreement that the deadline for the cure payment was March 3, 2008. *Id*. at 8; Opposition at 22. The parties also agree that GMAC received a cashier's check from Biddeford Savings Bank in the amount of $5,450.00 on or about February 28, 2008, USB Motion at 9; Opposition at 22, and that GMAC returned the check to the bank. *Id*.

---

[2] James does assert, in conclusory fashion, that *USB* breached the mortgage contract through "a calculation of payments that would have put Mr. James current but for GMAC's mishandling of the escrow account[.]" Opposition at 23. To the extent that this assertion may have been intended to assert a claim of breach of contract against *GMAC*, and in the absence of any identification of the portion of that written contract alleged to have been breached in this manner, this allegation on its face sounds, at most, in negligence rather than breach of contract.

USB relies on paragraphs 28-37 of its statement of material facts. USB Motion at 9. It sets forth the following factual scenario:

> [T]he check could not be credited to [James's] account because it lacked any identifying information such as the borrower name or account number. SOMF ¶¶ 28 and 29. As a result, the cashier's check was rejected and returned to the issuing bank, Biddeford Savings Bank. SOMF ¶ 32. Nearly three weeks later, after the deadline for cure established by the Notice, the cashier's check was returned to GMAC by Biddeford Savings Bank with [James's] name and account number added to the face of the check. SOMF ¶ 33; *see also* SOMF Ex. D. By the date of the second receipt, the cashier's check was no longer sufficient to cover the amount due on [James's] account and GMAC thus had to reject it. SOMF ¶¶ 34, 35 and 37.

*Id.* James responds that the evidence proffered by USB to support this scenario is all inadmissible and that, even if it is admissible, it proves "only that the check number and bank name were listed as 'payments that are returned because they could not be credited to an account maintained by GMAC' which could include a whole host of reasons including wrongful rejection of a valid check." Opposition at 22. Of course, speculation about "a whole host of reasons" other than the specific reason offered by USB will not suffice to prevent the entry of summary judgment if USB's evidence is in fact properly presented. *Robinson v. Westrum*, No. 09-cv-211-GZS, 2010 WL 2734778, at *1 (D. Me. July 12, 2010).

The first two paragraphs of its statement of material facts cited by USB in this regard are the following:

> When received by GMAC in February 2008, the Biddeford Check did not contain the name of a borrower.

> When received by GMAC in February 2008, the Biddeford Check did not contain an account number or other information identifying which GMAC-serviced account it was intended to be applied to.

USB SMF ¶¶ 28-29.  James moves to strike both of these paragraphs[3] for the following reasons:

> a.  This statement by Plaintiff and Lathrop Aff. ¶ 10 [cited as record authority for the paragraphs by the USB SMF] conflicts with the deposition testimony of the Plaintiff offered by its corporate designee Shalini Parker, and Plaintiff has offered no explanation for this conflicting testimony.
>
> b.  To the extent that Lathrop does have personal knowledge of the records created, kept and produced by GMAC, he is a witness with discoverable information whose identity should have been, but was not, disclosed by Plaintiff pursuant to F.R.Civ.P. 26(a) and in response to [James's] discovery requests.
>
> c.  To the extent that Lathrop Aff. ¶ 10 is not a statement made as a matter of his own personal knowledge it is hearsay.  If he is reliant upon Exhibit A to his affidavit to make that statement, only the document itself is admissible and not his characterization of its contents.

James Responsive SMF ¶¶ U/G28 & 29 (citations omitted).

> The paragraph of Lathrop's affidavit at issue provides:

> 10.  This record [of any payments that are returned because they could not be credited to any account maintained by GMAC] indicates that the check returned to Biddeford Savings Bank could not be credited to an account maintained by GMAC because the check lacked information that would allow GMAC to identify the borrower or the account that the check was intended as a payment for.  Specifically, when the check was initially received by GMAC it did not contain an account number or borrower name and thus it could not be credited to any one of the 20,596 [] loan accounts from the State of Maine that GMAC services.  The fact that the check was drawn on a bank in Maine was not sufficient information for us to match it to any specific account.

Affidavit of Scott Lathrop in Support of Plaintiff's Motion for Summary Judgment ("Lathrop Aff.") (Docket No. 92) ¶ 10.

> The deposition testimony of Shalini Parker, GMAC's Rule 30(b)(6) designee, which

---

[3] Local Rule 56(e) provides, in relevant part: "Motions to strike statements of fact are not allowed.  If a party contends that an individual statement of fact should not be considered by the court, the party may include as part of the response that the statement of fact 'should be stricken' with a brief statement of the reason(s) and the authority or record citation in support."

James contends contradicts this paragraph is apparently[4] the following:

> Q. And what was the date of receipt of this check?
> A. According to this, I think it was March 21st.
> Q. And you found that in the notes, the display notes? Is that what you're talking about?
> A. Yes.
> Q. Is that the first date GMAC received the check?
> A. Yes.

Deposition via Skype of GMAC Mortgage, LLC and U.S. Bank by Shalini Parker ("Parker Dep.") (Exh. 19 to Affidavit of Andrea Bopp Stark (Docket No. 123-1)) at 157:25-158:1-6.

> Q. I would like to go to Exhibit 8, which is the Biddeford Savings check. Do you have that?
> A. Yes.
> Q. It says, Biddeford Savings, A Whole New Equation, and then it says Check No. 848683; it that correct?
> A. Yes.
> Q. And then it says pay to the order of GMAC and has the account number and then Gordon James; is that right?
> A. Yes.
> Q. Is that the correct account number for Mr. James?
> A. Yes.

*Id*. at 156:22-25, 157: 1-9.

Contrary to USB's characterization, Opposition to Defendant's "Motions to Strike" (Docket No. 132) ¶¶ 28(a) and 29(a), both the Parker testimony and the Lathrop affidavit cannot reasonably be construed to "state that the check was first received by GMAC on March 21 in a form that could be credited to [James's] Account." Rather, Parker says flatly that the check was first received by GMAC on March 21 with identifying information on its face, while Lathrop says that it was first received earlier, lacking any identifying information.

---

[4] The citation to the deposition given in paragraph U/G 28(a) of James's response is "Tr.: 157:25, 158:106." The citation given in paragraph U/G29(a) is "Tr.: 156:22-25, 157:109." No page of the transcript of the Parker deposition includes a line numbered higher than 25. I accordingly have assumed that "106" should be "1-6" and "109" should be "1-9."

The First Circuit requires that, when an interested witness has given clear answers to unambiguous questions at deposition, that witness cannot resist summary judgment with an affidavit that is clearly contradictory absent a satisfactory explanation for the change. *Colantuoni v. Alfred Calcagni & Sons*, 44 F.3d 1, 4-5 (1st Cir. 1994). But, here, James cites no authority for the proposition that this prohibition extends to different individuals employed by the same party; indeed, he cites no authority at all for his position.

However, assuming *arguendo* that the prohibition extends to the circumstances present here, the objection gains James nothing. If Lathrop's sworn affidavit testimony is correct, as appears likely under the circumstances, the only timely payment proffered by James did not identify him or his mortgage, and James has not argued that GMAC was nonetheless required to check its over 20,000 Maine mortgages in an attempt to determine to which the Biddeford Savings Bank check should be applied. If Parker's deposition testimony is correct, the properly-identified check was received after the deadline for payment and thus was justifiably rejected by GMAC.

James's second objection to these paragraphs of the USB statement of material facts is also not well taken. To the extent that Lathrop has "personal knowledge of the records created, kept and produced by GMAC," James Responsive SMF ¶¶ U/G28(b) & U/G29(b), his affidavit is submitted in his role as a records custodian; to require all litigants to identify individuals who will testify as record custodians at the outset of a case, under Fed. R. Civ. P. 26(a), would be to impose a heavy burden in exchange for little benefit to the opposing party. James cites no authority in support of this argument, and I am aware of none. He has not attempted to demonstrate that he has been prejudiced by the allegedly late disclosure of the identity of a

record custodian, nor has he submitted the "discovery requests" which he alleges sought this information from USB or GMAC without success.

With respect to James's final objection, there is nothing in the Lathrop affidavit that indicates that paragraph 10 is not made upon his own personal knowledge. The contention that a document consisting only of columns of numbers must be submitted as evidence without explanation from a witness who knows what the columns mean is without merit.

Finally, James suggests in his memorandum of law, although not in Count I of his counterclaim and third-party complaint, that "the existence of a non-conforming cure letter" also breaches the mortgage contract. Opposition at 23. Specifically, he contends that the notice of cure sent to him with respect to his mortgage did not comply with paragraph 22 of the mortgage document. *Id*. at 15-17. In addition, he asserts that this failure entitles him to summary judgment, although it is not clear whether he continues to press this argument now that USB has withdrawn its complaint. *Id*. at 17. I will consider it in connection with Count I of the counterclaim and third-party complaint.

The paragraph of the mortgage on which James relies provides as follows, in relevant part:

> Lender may require immediate payment in full under this Section 22 only if all of the following conditions are met:
>
> (a) I fail to keep any promise or agreement made in this Security Instrument, including the promises to pay when due the Sums Secured;
>
> (b) Lender sends to me, in the manner described in Section 15 above, a notice that states:
>> (1) The promise or agreement that I failed to keep;
>> (2) The action that I must take to correct the default;
>> (3) A date by which I must correct the default. That date must be at least 30 days from the date on which the notice is given;
>> (4) That if I do not correct the default by the date stated in the notice, Lender may require immediate payment in full, and Lender or

another Person may acquire the Property by means of foreclosure and sale;

(5)     That if I meet the conditions stated in Section 19 ["Borrower's Right to Have Lender's Enforcement of this Security Interest Discontinued"] above, I will have the right to have Lender's enforcement of this Security Instrument discontinued and to have the Note and this Security Instrument remain fully effective as if immediate payment in full had never been required; and

(6)     That I have the right in any lawsuit for foreclosure and sale to argue that I did keep my promises and agreements under the Note and under this Security Instrument, and to present any other defenses that I may have; and

(c) I do not correct the default stated in the notice from Lender by the date stated in that notice.

Mortgage (Docket No. 123-44) § 22.

James first contends that the notice sent to him did not comply with the requirements of this paragraph because it does not identify the sender of the notice. Opposition at 16. There is no such requirement on the face of paragraph 22 of the mortgage. In support of this argument, James cites a case from the Maine District Court, Decision & Judgment, *BAC Home Loans Servicing, LP v. Thompson*, Docket No. WES-RE-09-930 (Me. Dist. Ct., West Bath, May 7, 2010).

That decision is distinguishable. It is based on interpretation of the Maine foreclosure statute, *id*. at 3, which is not mentioned in Count I in this case. Count I in this case is based only on the language of the "mortgage contract." Counterclaim ¶¶ 58-68. That statute requires that notice of default be given by the mortgagee, Decision & Judgment at 3, and in that case the interest of the lender/mortgagee was not transferred to the entity that sent the notice of default until more than three months after the notice was sent. *Id*. at 3-4. At no time does the court in that decision hold that the notice must "identify" its sender. What it does hold is that the lender

must be the entity that sends the notice and, from all that appears in this case, that is what happened here.

James asserts that "[t]he mortgage document clearly provides that the Lender must send the notice[,]" Opposition at 16, but does not provide a citation to that language in the document. Paragraph 22 of the mortgage, set forth above, does state that "the Lender" will send the notice of default to the borrowed. However, the cited case does not convince me that the fact that the notice does not include the name of the lender, Exh. D to Stephan Aff. (Docket No. 93-4), is determinative. James contends that GMAC, which asserts that it sent the notice, USB SMF ¶ 15, has not proved that it was the agent of USB with respect to his loan. James Responsive SMF ¶ U/G15. But, the Rule 30(b)(6) deposition of GMAC upon which James relies in support of other arguments against the instant motion for summary judgment, establishes just that. Parker Dep. at 39-40.[5]

James next argues that the default letter cannot stand because it "does not include the statement mandated by Mortgage Paragraph 22(b)(5)[.]" Opposition at 16. It is true that the letter does not contain a word-for-word recitation of that subparagraph of the mortgage, but the essential terms of that subparagraph are conveyed in the letter, and that is enough. James cites *In re Colony Square Co.*, 843 F.2d 479 (11th Cir. 1988), for the proposition that a lender using plain language in its mortgage "should be held to strict compliance in the use of that language in the default letter." Opposition at 16. But, that opinion, which is not binding authority in the First Circuit, was based on Georgia law and, in any event, no notice or opportunity to cure was

---

[5] USB asserts, Opposition to Defendant's "Motions to Strike" (Docket No. 132) at 5, that James has submitted into the summary judgment record the very servicing agreement the absence of which he cites as a basis of his motion to strike paragraph 15 of USB's statement of material facts, James Responsive SMF ¶ U/G15, which states that GMAC sent the notice of default at issue to James on February 1, 2008. The motion to strike paragraph 15 is overruled. James's alternative denial of this paragraph, based on the presence in the underlying affidavit of the phrase "on or about February 1, 2008," rather than merely "on February 1, 2008" is also stricken, for the reasons discussed in the text.

given at all. 843 F.2d at 481. It cannot be read to support James's position, particularly since Maine law, which is not cited by James, would presumably provide the relevant legal standard.

James's third assault on the default notice is the assertion that it "makes no attempt to include the statement mandated by Mortgage Paragraph 22(b)(6) of the right of the Defendant in any foreclosure to argue that he did keep his promises under the note and mortgage and to present other defenses." Opposition at 16-17. This is an accurate observation about the letter. Both of the Maine cases cited by James in support of his argument that the terms of the mortgage must be strictly performed, *Camden Nat'l Bank v. Peterson,* 2008 ME 85, ¶¶ 20-21, 948 A.2d 1251, 1257, and *Keybank Nat'l Ass'n v. Sargent*, 2000 ME 153, ¶¶ 34-37, 758 A.2d 528, 537, deal, like the lower court in *BAC*, with statutory requirements in this context. I cannot conclude that these requirements do not apply to the mortgage at issue here.

It is not apparent from the summary judgment record whether or how James was prejudiced or harmed by the failure to include the terms of paragraph 22(b)(6) in the default letter. This lack of information creates an unresolved issue of material fact with respect to James's claim on this issue.

On the showing made, neither USB and GMAC nor James are entitled to summary judgment on Count I of the counterclaim and third-party complaint.

### b. Count II

Count II of the counterclaim and third-party complaint alleges violation of the Maine Consumer Credit Code and the federal Truth in Lending Act by USB, GMAC, and Quicken.[6] Counterclaim ¶¶ 69-93. USB and GMAC contend that this count fails because the Truth in Lending disclosure statement (the "TIL") provided to James was fully compliant with both the state and the federal statutes, because any errors on the TIL caused no harm to James, because

---

[6] Quicken's motion for summary judgment is addressed separately in section III(B), *infra*.

James's demand for rescission came too late, and because any errors were not apparent on the face of the TIL. USB Motion at 10-21.

Because James's arguments against the motions for summary judgment on this count are all based on alleged actions or inactions of Quicken, Opposition at 26-36, asserting that USB and GMAC are liable for the rescission of the loan that he seeks through this claim as "assignees," *id.* at 31, I defer discussion of this claim as it relates to USB to my consideration of Quicken's motion for summary judgment later in this decision. However, James has submitted no evidence to establish that GMAC was an "assignee" of the mortgage originated by Quicken, and GMAC accordingly is entitled to summary judgment on this count.[7]

### c. Count III

Count III of the counterclaim and third-party complaint alleges that USB, GMAC, and Quicken violated the Real Estate Settlement Procedures Act ("RESPA"), 12 U.S.C. § 2601 *et seq.*, and the Maine Consumer Credit Code ("MCCC"), 9-A M.R.S.A. § 9-305-A. Counterclaim ¶¶ 94-106. Specifically, James alleges that USB, GMAC, and Quicken failed to make timely payments out of an escrow account of the premiums on his homeowner's insurance policy on the property at issue, resulting in extra fees, inaccurate notices of default, and initiation of foreclosure proceedings. *Id.* ¶¶ 95-103. In addition, he asserts that USB and GMAC violated 12 U.S.C. § 2605(e)(2) by failing to respond to his Qualified Written Request within 60 days of their receipt of that document. *Id.* ¶¶ 104-06.

USB contends that it is not the servicer of the mortgage at issue, as that term is defined in the cited statutes, and, therefore, it cannot be liable under either statute. USB Motion at 21. It adds that this court has dismissed all of these claims against it based on a finding that it was not

---

[7] In addition, James has withdrawn his claim that TILA and the similar Maine statute were violated because he was not provided with two copies of the notice of default. Counterclaim ¶ 91; USB SMF ¶ 48; James Responsive SMF ¶ U/G 48.

the servicer of James's loan. *Id.* James does not respond directly to either of these arguments, limiting himself to assertions that "[t]he actions of . . . US Bank . . . contributed to the failure of GMAC to make timely payments from the escrow account," Opposition at 37, and "US Bank, as the alleged holder of the loan, is liable for the actions of GMAC who it used to service the loan." *Id.* at 41. Neither conclusory statement is accompanied by any citation to authority. In any event, USB is correct. This claim, which was at the time Count II of the counterclaim and third-party complaint, was dismissed as against USB earlier in this litigation. Docket No. 29. USB is simply no longer a party to this claim.

GMAC asserts that "mere mismanagement of an escrow account does not create a violation of RESPA or the MCCC." Motion at 21. That may be true, *see In re Jacques*, 416 B.R. 63, 74 (E.D.N.Y. 2009), but that is not all that James alleges. The counterclaim and third-party complaint alleges violation of specific sections of both the federal and the state statutes. Counterclaim ¶¶ 95-96, 105. James's memorandum of law is even more specific. He contends that a GMAC auditor reviewed the loan documents on or around June 27, 2005. James SMF ¶ J63; USB Responsive SMF ¶ J63.[8] He also asserts that GMAC failed to pay a premium on his homeowner's policy from Concord Insurance when it came due. James SMF ¶ J51. USB and GMAC deny this paragraph of James's statement of material facts, USB Responsive SMF ¶ J51, but a question of fact has been raised on this point by James's submission. Mortgage loan servicers are required to make timely payments from a mortgagor's escrow account pursuant to both the state, 9-A M.R.S.A. § 9-305-A, and federal, 12 U.S.C. § 2605(g), statutes. James has

---

[8] USB's qualification of this paragraph, USB Responsive SMF ¶ J63, has no effect on the substance of the paragraph as stated in the text.

demonstrated a disputed issue of material fact on the question of whether GMAC did so. GMAC is not entitled to summary judgment on Count III, except as noted below.[9]

### d. Count IV

Count IV of the counterclaim and third-party complaint alleges that USB, GMAC, and Quicken violated the Maine Unfair Trade Practices Act ("Maine UTPA"), 5 M.R.S.A. §§ 206-14. Counterclaim ¶¶ 107-09. With respect to USB, James identifies no instance of a violation of the Maine UTPA, merely asserting that GMAC's allegedly violative conduct was "on behalf of US Bank." Opposition at 42-45. Liability under the Maine UTPA attaches only to the party that performed the unfair or deceptive act. 5 M.R.S.A. § 213(1). Accordingly, USB is entitled to summary judgment on this count.

With respect to GMAC, James identifies the following as instances of violation of the Maine UTPA: "failure to obtain proper proof of insurance, pay timely the insurance premium for the policy in place and follow its own policies regarding force placing insurance" which "led to the placement of duplicate coverage on the property at an outrageous cost to [James's] escrow account and the eventual foreclosure proceedings;" sending a deficient cure letter, miscalculating the amount owed based on its "imposition of outrageously expensive and duplicate homeowner's coverage . . . and then failing to fully and timely credit Mr. James' escrow account for such coverage;" "attempt[ing] to collect monies to which it was not entitled based on its own mismanagement of the escrow funds;" and rejecting a timely offer of sufficient funds to cure James's default. Opposition at 43-45.

---

[9] James contends that GMAC also violated RESPA by "fail[ing] to correct the errors [in its handling of his escrow account] despite notification and requests sent to them from Mr. James' counsel[.]" Opposition at 41. The only paragraph of his statement of material facts cited in support of this contention does not support it. James SMF ¶ J23: "Mr. James sent a Notice of Rescission to Quicken Loans and counsel for Wells Fargo and GMAC on May 12, 2008, and a follow-up letter on August 6, 2008." GMAC is entitled to summary judgment on that portion of Count III.

The Maine UTPA provides, in relevant part:

> Any person who purchases or leases goods, services or property, real or personal, primarily for personal, family or household purposes and thereby suffers any loss of money or property, real or personal, as a result of the use or employment by another person of a method, act or practice declared unlawful by section 207 . . . may bring an action . . . for actual damages, restitution and for such other equitable relief . . . as the court determines to be necessary and proper.

5 M.R.S.A. § 213(1). Section 207, to which section 213 refers, provides, in relevant part, that "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce are declared unlawful." 5 M.R.S.A. § 207.

The words "unfair" and "deceptive" are not defined in the Maine UTPA. The applicable definitions have been supplied by the Maine Law Court.

> To justify a finding of unfairness, the act or practice: (1) must cause, or be likely to cause, substantial injury to consumers; (2) that is not reasonably avoidable by consumers; and (3) that is not outweighed by any countervailing benefits to consumers or competition.

*State v. Weinschenk*, 2005 ME 28, ¶ 16, 868 A.2d 200, 206. "The substantial injury requirement is designed to weed out trivial or merely speculative harms." *Tungate v. MacLean-Stevens Studios, Inc.*, 1998 ME 162, ¶ 10, 714 A.2d 792, 797 (citation and internal quotation marks omitted),

> An act or practice is deceptive if it is a material representation, omission, act or practice that is likely to mislead consumers acting reasonably under the circumstances. A material representation, omission, act or practice involves information that is important to consumers and, hence, likely to affect their choice of, or conduct regarding, a product. An act or practice may be deceptive, within the meaning of Maine's UTPA, regardless of a defendant's good faith or lack of intent to deceive.

*Weinschenk* ¶ 17 (citations and internal quotation marks omitted).

James first contends that GMAC is liable under the Maine UTPA "for its failure to provide a proper audit of the disclosures" made by Quicken before the mortgage was transferred.

Opposition at 43. He does not explain how a "failure to audit" itself constitutes an unfair or deceptive act or practice.[10] Since James does not allege that GMAC reported to him the results, if any, of its allegedly improper audit, I fail to see how such action or inaction could constitute an unfair or deceptive practice, as the Law Court has defined those terms for purposes of the Maine UTPA.

James next asserts that GMAC "as escrow agent[] for Mr. James, owed him a heightened duty of care." *Id*. That may well be true for purposes of a tort claim against GMAC, but it has no relevance to this statutory claim. He goes on to contend that "GMAC's failure to obtain proper proof of insurance, pay timely the insurance premium for the policy in place and follow its own policies regarding force placing insurance led to the placement of duplicate coverage on the property . . . and the eventual foreclosure proceedings on the property." *Id*. He asserts that these failures constitute unfair trade practices. *Id*. at 43-44. The paragraphs he cites in support of this argument, some of which are disputed by GMAC, provide a factual basis for this argument. James SMF ¶¶ J48, J50-59; USB's Responsive SMF ¶¶ J48, J50-59. Such failures do appear to be likely to cause substantial harm to consumers of residential mortgages, and that harm would not reasonably be avoidable by consumers, who would have no knowledge of the failures before some harm had been caused, and would be without countervailing benefits. The harm certainly would be avoidable by consumers, as GMAC contends, Motion at 24, once the effect of the failures became apparent, but that might well not occur until substantial harm had already been inflicted. While the question is a close one, James has established a dispute of material fact on this issue.

---

[10] In addition, James fails to provide a citation to any record support for the assertion that GMAC did fail to conduct a "proper" audit. His supporting citation to the record reads, in its entirety: "JSMF ¶ J__." Opposition at 43. This lack of evidentiary support is itself sufficient to require the court to conclude that James has not established a disputed material fact as to this argument.

Therefore, because GMAC is not entitled to summary judgment on Count IV of the third-party complaint, I will address James's remaining arguments with respect to this count only briefly. I have already determined that the deficient cure letter itself caused no harm to James, so it cannot have constituted a violation of the Maine UTPA. James hotly disputes GMAC's assertion that his savings bank's first submission of a check in an attempt to cure his default was unidentifiable, but he has not offered any evidence that suggests that this was not in fact the case. The rejection of that check thus was not wrongful and could not have violated the Maine UTPA. The fact that GMAC did not call the savings bank at this point rather than returning the check has no impact on this analysis, as James offers no legal requirement that it do so.

### e. Count V

Count V of the counterclaim and third-party complaint alleges that USB, GMAC, and Quicken negligently and/or intentionally inflicted severe emotional distress on James. Counterclaim ¶¶ 110-13. Under Maine law, damages for emotional distress as a result of a breach of contract are not recoverable, *McAfee v. Wright*, 651 A.2d 371, 372 (Me. 1994), so Count I cannot serve as a basis for this claim. However, on this claim USB can be held liable as the principal of GMAC. *Advanced Constr. Corp. v. Pilecki*, 2006 ME 84, ¶ 16, 901 A.2d 189, 196.

### i. Negligent infliction of emotional distress

The tort of negligent infliction of emotional distress "requires either a unique relationship between the plaintiff and the defendant, or an underlying tort," or bystander status. *Richards v. Town of Eliot*, 2001 ME 132, ¶ 34, 780 A.2d 281, 293. In the instant case, there is no claim of bystander status. James refers, in passing, to his Maine UTPA claim as the underlying tort, but does not develop any argument on this point. Opposition at 47. Such a brief mention,

unaccompanied by developed argumentation, is deemed a waiver of the issue. *De Araujo v. Gonzáles*, 457 F.3d 146, 153 (1st Cir. 2006).

In addition to establishing the existence of a unique relationship between himself and GMAC, James must also show that GMAC acted, or failed to act, in a manner that a reasonably prudent mortgage loan servicer would act in the management of its affairs, taking in account all of the circumstances of this case, that emotional distress to James was a reasonably foreseeable result of the negligent act or failure to act, and that he suffered serious emotional distress as a result of the negligence. *Gayer v. Bath Iron Works Corp.*, 687 A.2d 617, 622 (Me. 1996) (citation omitted). Serious emotional distress exists "where a reasonably person normally constituted[] would be unable to adequately cope with the mental stress engendered by the circumstances of the event." *Id*.

GMAC first argues that no special relationship between it and a mortgagor is recognized in Maine law. Motion at 27-28. James responds that "[t]he relationship between escrow agent and homeowner is akin to those special relationships [of physicians and patients, hospitals and the families of the deceased, and psychotherapists and patients] because it involves the trust and lowering of boundaries that is similar[]." Opposition at 48. However, given the Law Court's ongoing refusal to recognize the necessary special relationship in circumstances beyond those specified in James's argument, I am not willing to predict that it would recognize the relationship between a mortgagor and the escrow agent servicing the mortgage as sufficiently special to allow the mortgagor to recover for negligent infliction of emotional distress.

USB and GMAC are, therefore, entitled to summary judgment on James's claim of negligent infliction of emotional distress.

ii. Intentional Infliction of Emotional Distress

Under Maine law,

> [t]o withstand a . . . motion for summary judgment on a claim of intentional infliction of emotional distress, [James] must present facts in support of each of the following four elements:
>
> (1) [GMAC] intentionally or recklessly inflicted severe emotional distress or was certain or substantially certain that such distress would result from [its] conduct;
>
> (2) the conduct was so extreme and outrageous as to exceed all possible bounds of decency and must be regarded as atrocious, utterly intolerable in a civilized community;
>
> (3) the actions of [GMAC] caused [James's] emotional distress; and
>
> (4) the emotional distress suffered by [James] was so severe that no reasonable person could be expected to endure it.

*Curtis v. Porter*, 2001 ME 158, ¶ 10, 784 A.2d 18, 22-23 (citation and internal punctuation omitted).

James's claim founders on the second element. He asserts that the relevant conduct of GMAC, which was allegedly reckless rather than intentional, was the same conduct that forms the basis of his other claims. Opposition at 46. Merely characterizing these actions and failures to act as "outrageous" does not make them so. The alleged actions, and failures to act, by GMAC, while certainly far from admirable, do not rise to the level of "conduct so extreme and outrageous as to exceed all possible bounds of decency and must be regarded as atrocious, utterly intolerable in a civilized community."

USB and GMAC are entitled to summary judgment on James's claim of intentional infliction of emotional distress in Count V of his counterclaim and third-party complaint.

## B. Quicken

The legal standards for summary judgment set forth in section III(A)(1) of this memorandum decision are applicable as well to this analysis of Quicken's motion for summary judgment.

### 1. Factual Background

The following material facts are undisputed and were submitted in accordance with this court's Local Rule 56. Only those which are not duplicative of those set forth in section III(A)(2) of this memorandum decision are set forth here.

On June 30, 2005, James entered into a home loan with Quicken to refinance his property located at 1088 Alfred Road in Arundel, Maine. Third Party Defendant Quicken Loans Inc.'s Statement of Material Facts ("Quicken SMF") (Docket No. 94) ¶ 1; James Responsive SMF ¶ Q1.[11] On the TIL that James signed at the closing on June 30, 2005, the monthly payments for the loan were disclosed in the payment schedule as $1,029.83 for the first 120 payments, $1,458.43 for the next 51 payments, and $1,423.93 for the remaining 189 payments. *Id.* ¶ 2. On the amortization schedule for the loan provided to James, the monthly payments were shown as $1,029.83 for the first 120 payments with $81.08 applied to private mortgage insurance ("PMI"), $1,458.43 for the next 52 payments with $34.50 applied to PMI, and $1,423.93 for the remaining 188 payments with no PMI. *Id.* ¶ 3.

The TIL disclosed the finance charge as $266,921.30, the amount financed as $200,161.00, and the total of payments as $467,082.30. *Id.* ¶ 5. At the time, the Concord Group was providing homeowner's insurance for the property. *Id.* ¶ 8. On the HUD-1 settlement statement signed by James at the closing, the annual hazard insurance premium was listed as

---

[11] James filed a single statement of material facts responsive to the statements of material facts filed separately by GMAC and Quicken. He identifies his responses to Quicken's statement of material facts by prefacing each paragraph number with a Q.

$133.  *Id*. ¶ 9.[12]  The quarterly premium, including a service charge, due for The Concord Group's homeowner's insurance coverage on the property for May 30, 2005, to August 30, 2005, was $133.  *Id*. ¶ 10.  The billing notice for this premium was provided to Quicken before the closing.  *Id*. ¶ 11.

Quicken set up the escrow account for homeowner's insurance using the $133 amount from the quarterly billing notice as the annual premium amount due for homeowner's insurance. *Id*. ¶ 12.[13]  The monthly payment letter dated June 30, 2005, which James signed at the closing, listed the monthly homeowner's insurance escrow payment as $11.08.  *Id*. ¶ 13.  A document titled "Here's How Your Numbers Work," dated June 30, 2005, that James received at or before the closing listed his monthly homeowner's insurance escrow payment as $11.08.  *Id*. ¶ 14.  The declarations page for the policy then in place on the property stated that the yearly premium for the homeowner's insurance was $516.00, making the monthly cost of the premium $43.  James SMF ¶ J30.

Quicken sold the note and servicing rights to the loan to GMAC on or about July 20, 2010.  Quicken SMF ¶ 15.[14]  GMAC received the billing notice dated May 1, 2005, from Quicken at or around the same time the note and servicing rights to the loan were sold to GMAC.

---

[12] The portion of this paragraph of Quicken's statement of material facts that James purports to qualify is omitted. James Responsive SMF ¶ Q9.  I do note, however, that the document cited by Quicken in support of this paragraph, which James contends does not support that portion of the paragraph and that "the Defendant has no independent ability to determine the truth of the statement[,]" *id*., was submitted by James initially, Docket No. 66 at 30, and is signed by James.

[13] James moves to strike this paragraph of Quicken's statement of material facts because it uses the word "mistakenly" before the words "set up."  James Responsive SMF ¶ Q12.  That motion is denied.  In the alternative, James purportedly qualifies his response, denying that Quicken's actions were mistaken.  *Id*.  It is difficult to conceive of any reason why a mortgage lender or loan servicer would intentionally set up an escrow account based on an erroneous insurance premium amount, but I have omitted the word from the recitation of facts in the text of this opinion.

[14] James moves to strike this paragraph because it "is not supported by a record reference to admissible evidence" and the interrogatory answer cited by Quicken as support for the paragraph is hearsay.  James Responsive SMF ¶ Q15.  Interrogatory answers are not inadmissible *per se* and nothing on the face of the interrogatory answer suggests that it is hearsay.  Exh. C to Quicken SMF.  The motion is denied.  James also purports to deny the paragraph for the same reasons; that denial is stricken.

*Id.* ¶ 16.[15]  Quicken used the billing statement from the Concord Group that covered the period of May 30, 2005, to August 30, 2005, to calculate the monthly escrow payment for homeowner's insurance. James SMF ¶ J25.  Quicken's corporate representative testified that Quicken required a copy of the homeowner's insurance policy as proof of homeowner's insurance to close a loan. Quicken SMF ¶ 26.

In the fall of 2005, GMAC came to believe that James did not have insurance coverage for the property at issue and sent him a letter asking for proof of coverage.  *Id.* ¶ 17.  James first contacted GMAC regarding his insurance coverage on November 4, 2005.  *Id.* ¶ 18.  The first lender-placed insurance policy for the loan was paid by GMAC on January 16, 2006, for coverage from July 29, 2005, to July 29, 2006.  *Id.* ¶ 19.

The Concord Group cancelled the homeowner's insurance police for the property for non-payment of premium which was originally due on May 30, 2006.  *Id.* ¶ 21.  GMAC subsequently obtained several other lender-placed insurance policies in connection with the loan, paying $1,759.00 on August 1, 2006, $8,500.00 on December 13, 2007, and $8,500.00 on January 16, 2008.  *Id.* ¶ 22.

The PMI notice for the loan provides that PMI automatically terminates on the date when the principal balance of the loan is first scheduled to reach 78% of the original value of the property.  James SMF ¶ J3; Quicken Loans Inc.'s Reply Statement of Material Facts ("Quicken Responsive SMF") (Docket No. 133) ¶ J3.  The principal balance on the loan was scheduled to reach 78% of the original principal balance after the 172nd payment.  *Id.* ¶ J1.  The 172nd payment shown on the TIL is $34.50 short.  *Id.* ¶ J9.  According to the amortization schedule created by Quicken for James's loan, PMI would terminate after the 172nd payment.  *Id.* ¶ J16.

---

[15] James moves to strike this paragraph of Quicken's statement of material facts for the same reasons cited in support of his motion to strike paragraph 15.  The motion is denied for the same reasons.  James's alternative, purported qualification of the paragraph is subject to the same infirmities, and stricken for the same reasons.

The number of payments at $1,423.93 on the TIL should have been 188, not 189.  *Id.* ¶ J10.  The number of payments at $1,458.43 on the TIL should have been 52, not 51.  *Id.* ¶ J12.

James sent a notice of rescission to Wells Fargo and GMAC on May 12, 2008, with a copy to Quicken.  *Id.* ¶ J23.  He sent a follow-up letter on August 6, 2008.  *Id.*

### 2. Discussion

### a. Count II

Count I of the third-party complaint/counterclaim is not asserted against Quicken.  Count II alleges violation of the Maine Consumer Credit Code and the federal Truth in Lending Act.  Counterclaim ¶¶ 69-93.  Quicken contends that it met all of the requirements of these statutes upon which James relies.  Third Party Defendant Quicken Loans Inc.'s Motion for Summary Judgment ("Quicken Motion") (Docket No. 95) at 4-9.  The parties appear to agree that the analysis for both the state and the federal statutory claims is the same.

The third-party complaint alleges that Quicken violated the requirement imposed by these statutes, that all material disclosures be made clearly and conspicuously, by failing to mention in the TIL that James would be charged PMI, that the loan "included or required PMI,"  or the specific amount of the charge for PMI; by failing to explain that the monthly payments was higher than indicated on the note due to PMI or why the monthly payments would decrease after the second set of 51 payments; by failing to include PMI on the good faith estimate; and by giving him a monthly payment letter that showed a payment of $81.08 per month for PMI, thereby "contradict[ing]" the TIL and the good faith estimate.  Counterclaim ¶¶ 73-76, 78-80.

i. The payment schedule disclosure

Quicken contends that it was not required to list PMI separately on the TIL, that it did include PMI on the payment schedule as required, and that PMI was included in the total of payments disclosed on the TIL. Quicken Motion at 4-8.

The statutes at issue provide:

> Information required by this subchapter shall be disclosed clearly and conspicuously, in accordance with regulations of the Board. The terms "annual percentage rate" and "finance charge" shall be disclosed more conspicuously than other terms, data, or information provided in connection with a transaction[.]

15 U.S.C. § 1632(a).

> Information required by this Article shall be disclosed clearly and conspicuously, in accordance with regulations of the administrator. The terms "annual percentage rate" and "finance charge" shall be disclosed more conspicuously than other terms, data or information provided in connection with a transaction[.]

9-A M.R.S.A. § 8-202(1).

The question thus becomes whether James has shown that some aspect of the PMI charge, or some other disclosure, was not "clearly and conspicuously" made, in accordance with applicable regulations. Creditors must disclose the finance charge, the annual percentage rate, the amount financed, the total of payments, and the schedule of payments. 15 U.S.C. § 1602(u).

James first asserts that Quicken's payment schedule violated TILA because it disclosed 171 payments including mortgage insurance instead of 172. Opposition at 26-27. Quicken agrees that $34.50 is missing from the 172nd payment listed on this schedule. Quicken Loans Inc.'s Reply to Gordon James' Opposition to Motion for Summary Judgment ("Quicken Reply") (Docket No. 142) at 1-2. Quicken relies, however, on the applicable tolerance level statute. *Id.* at 2. That statute provides, in relevant part:

In connection with credit transactions . . . that are secured by real property or a dwelling, the disclosure of the finance charge and other disclosures affected by any finance charge –

   (**1**) shall be treated as being accurate for purposes of this subchapter if the amount disclosed as the finance charge –

   (**A**) does not vary from the actual finance charge by more than $100; or

   (**B**) is greater than the amount required to be disclosed under this subchapter; and

   (**2**) shall be treated as being accurate for purposes of section 1635 of this title if –

   (**A**) except as provided in subparagraph (B), the amount disclosed as the finance charge does not vary from the actual finance charge by more than an amount  equal to one-half of one percent of the total amount of credit extended[.]

15 U.S.C. § 1605(f).[16]  *See also* 9-A M.R.S.A. § 8-105(6) (same).

James asserts that "the finance charge disclosure in Quicken's TIL was correctly calculated and disclosed[,]" so the tolerance statute cannot be applied to any other disclosure affected by it.  Opposition at 28.  However, as Quicken notes, Quicken Reply at 2, the number of PMI payments included in the payment amounts entered onto the payment schedule and the amount of PMI included in the calculation of the finance charge are dependent on each other, and are affected by the disclosure of the charge for PMI, which is a finance charge.  15 U.S.C. § 1605(c); 9-A M.R.S.A. § 8-105(3).  In this case, $34.50 is well within the statutory tolerance level on a mortgage loan with a principal amount of $200,161.00 and a finance charge of $ 266,921.30.  Quicken SMF ¶ 5; James Responsive SMF ¶ Q5.

None of the case law cited by James requires a different outcome on this issue.  In *Douglas v. Foundation Funding Group, Inc.*, No. 1:03-cv-2538-WSD-ECS, 2005 WL 6466539, at *3-*4 (N.D. Ga. Feb. 24, 2005), the lender did not contend that any portion of the finance charge itself was misstated, merely that errors in the disclosure of the monthly payment and total

---

[16] James does seek rescission under section 1635 in this case.  Counterclaim ¶¶ 92-93.

of payments due were "affected by the finance charge." Here, the PMI is defined by the applicable statutes as part of the finance charge.

In *Smith v. Chapman*, 614 F.2d 968, 970, 977 (5th Cir. 1980), "the tax figure [was placed] in the wrong space [on a contract form for a retail installment purchase of a car] when another space [was] specifically provided[,]" and the form stated that sales tax was included in the stated figure, but it was not. That factual situation is not analogous to the one presented here.

In *Roberts v. Fleet Bank (R.I.)*, 342 F.3d 260, 266 (3d Cir. 2003), the court denied summary judgment under TILA's clear and conspicuous provision to a credit card issuer that had allegedly failed to disclose the fact that the annual percentage rate charged on balances carried on the card could change at any time.

James also contends that "the incorrect numbers of payments" – 51 instead of 52 at one level of monthly payment and 189 instead of 188 at the other – and the resulting "erroneous start date" for the change are not subject to the tolerance statute and alone require rescission. Opposition at 29. However, in the only authority he cites that addresses this situation, *In re Wepsic*, 231 B.R. 768 (S.D. Cal. 1998), the court distinguished the case before it from one in which the correct total number of payments disclosed was correct. *Id*. at 773. That is also the case here.

ii. Inaccurate Total of Payments

James next contends that the sum of all payments disclosed in the payment schedule is incorrect. According to James, the correct total is $467,116.80, but the amount disclosed on the schedule is $467,082.30. Opposition at 30. Here again, the missing amount appears to be the $34.50 payment for PMI. But, the only citation to the record given in support of the asserted "correct" sum by James, paragraph 19 of his statement of material facts, *id*., does not support this

assertion. The remainder of the argument on this point submitted by James, *id*. at 30-31, is unsupported by any citation to his statement of material facts in support of his factual assertions and, therefore, will not be considered by the court.

### iii. Material Disclosures[17]

James next asserts that "[e]ven accurate disclosures may be rendered . . . not clear and conspicuous . . . by other conflicting information on the TIL itself and in other loan documents." *Id*. at 32. He contends that "[s]uch conflicts here undermined the payment schedule disclosure and allowed [him] to rescind whether or not his payment schedule was accurately disclosed." *Id*. at 32-33. None of the authority he cites actually supports this construction of the statutory scheme.

Thus, the page of *Beach v. Ocwen Fed. Bank*, 523 U.S. 410 (1998), cited by James, Opposition at 33, merely recites the basic terms of TILA. 523 U.S. at 412. In *Rand Corp. v. Moua*, 559 F.3d 842 (8th Cir. 2009), the court upheld rescission of a mortgage where the borrowers were required to sign a single document stating that they had been notified of their right to rescind and that the rescission period had already expired. *Id*. at 847. Nothing so directly contradictory appears in the summary judgment record, and none of the "contradictions" alleged by James appear in the same document.

In *Santos-Rodriguez v. Doral Mortgage Corp.*, 485 F.3d 12 (1st Cir. 2007), for which James provides no pinpoint citation, Opposition at 33, the First Circuit joined other courts in holding that TILA's clear and conspicuous standard "is less demanding than a requirement of

---

[17] In a subsection of his memorandum of law entitled "Assignee Liability," James contends that he may assert a "damages claim" under TILA "after the statute of limitations [for such a claim] has run" as "claims in recoupment" may be "raise[d] . . . defensively . . . [to] defeat summary judgment[,]" citing 15 U.S.C. § 1640(e). Opposition at 32. Since USB is no longer pressing any claim of its own against James, this argument is not available to him. The statute is not intended to allow a mortgagor to defend against a motion for summary judgment on his own counterclaim or third-party claims. It is limited by its terms to such use "in an action to collect the debt." 15 U.S.C. § 1640(e). James's current attempted use of this portion of the statute cannot reasonably be termed "recoupment" or "an action to collect the [mortgage] debt."

perfect notice" and that the borrowers had received sufficient notice of their right of rescission even though the lender had not used Form H-9, which the Federal Reserve Board had designed for notification of the right of rescission. 485 F.3d at 16-17. In *McKenna v. First Horizon Home Loan Corp.*, 475 F.3d 418 (1st Cir. 2007), for which James also provides no pinpoint citation, Opposition at 33, the issue before the court was the availability of class certification in a TILA case, 475 F.3d at 421-22, an issue not involved in the instant case.

On the page of *Palmer v. Champion Mortgage*, 465 F.3d 24 (1st Cir. 2006), cited by James, Opposition at 33, the First Circuit merely sets out the provisions of TILA relevant to rescission. 465 F.3d at 27. On the following page, the court holds that, while the notice of the right of rescission sent to the plaintiffs stated a deadline for rescission that had passed before the plaintiffs received the notice, the notice also indicated twice, in plain language, that, in the alternative, the plaintiffs could rescind within three days after receipt of the notice, and that this notice was adequate. *Id*. at 28. And, the page of the opinion in *Belini v. Washington Mut. Bank,* 412 F.3d 17 (1st Cir. 2005), cited by James, Opposition at 33, is again merely a recitation of the terms of TILA. 412 F.3d at 20.

None of the cited authority holds that numbers in a document different from the TIL, which are themselves correct for the purposes of that document, render numbers on the TIL fatally unclear and/or inconspicuous merely because someone might be able to characterize the two sets of accurate numbers as somehow contradictory or inconsistent.

James also challenges Quicken's "failure" to use form H-2 rather than form H-1 to make its disclosures. He asserts that this places the form he received "outside the framework provided by Regulation Z,"[18] and thus "significantly changed the[] presentation to the consumer" of the required types of insurance, thereby "strongly suggest[ing] that PMI was neither required nor

---

[18] 12 C.F.R. § 226.

included in the schedule of payments."  Opposition at 33-34.  I read no such suggestion, strong or weak, in the form presented to James.  While James asserts that adding a box for PMI to the TIL "would have mitigated the confusion Quicken created by modifying the model form," *id*. at 35, he is careful not to say that such a box was legally required, because it was not.  After all, the question "is not whether the notification in [the form not provided to the borrowers] would have been more complete than the notification [the borrowers] actually received, but only whether the notification [the borrowers] actually received met the requirements of the clear and conspicuous standard laid out in Regulation Z."  *Santos-Rodriguez*, 485 F.3d at 18.

### iv.  Notice of Rescission

Finally, James contends, in conclusory fashion, that GMAC's "failure[] to honor [his] valid rescission preclude [USB, GMAC and Quicken] from summary judgment on this claim."  Opposition at 36.  To the contrary, James has not established that he is entitled to rescission based on this count, and, therefore, USB and the two third-party defendants, GMAC and Quicken, are entitled to summary judgment on Count II.

Similarly, because James has not shown that Quicken is not entitled to summary judgment on this count, he cannot establish that USB is somehow liable for Quicken's actions or inactions, and USB is entitled to summary judgment on this count as well.

### b.  Count III

Count III of the third-party complaint alleges violation of the Maine Consumer Credit Code, specifically 9-A M.R.S.A. § 9-305-A, and the federal Real Estate Settlement Procedures Act.  Counterclaim ¶¶ 94-106.  Quicken argues that it is entitled to summary judgment on this count because the failure to pay the premium for homeowner's insurance that is the gravamen of this count occurred after it had sold the loan.  Quicken Motion at 9-12.

James's argument in opposition is not entirely clear. He spends some time setting out what he sees as Quicken's errors in creating the escrow account for his loan and in mailing the notice of transfer of the loan to the Concord Group at an allegedly wrong address. Opposition at 36-41. Again, the Maine statute on which James relies provides as follows:

> A creditor, assignee or servicer that holds or controls funds of a consumer in an escrow account for the payment of taxes or insurance premiums shall make timely payments from that escrow account for a consumer credit transaction secured by a mortgage on real estate. A creditor, assignee or servicer is liable to the consumer for actual damages resulting from failure to make timely payments from that escrow account.

9-A M.R.S.A. § 9-305-A.

The relevant portion of the federal statute upon which James relies is the following:

> If the terms of any federally related mortgage loan require the borrower to make payments to the servicer of the loan for deposit into an escrow account for the purpose of assuring payment of taxes, insurance premiums, and other charges with respect to the property, the servicer shall make payments from the escrow account for such taxes, insurance premiums, and other charges in a timely manner as such payments become due.

12 U.S.C. § 2605(g).

Nothing in James's statement of material facts establishes even a disputed fact that would allow a factfinder to conclude that, during the brief time that Quicken was the servicer on James's loan that is the subject of this lawsuit, any payments out of the escrow fund for homeowner's insurance were due. The statutes cannot be reasonably construed to apply to Quicken in this case.

James's memorandum suggests that he intends to argue that Quicken bears some liability under these statutes because its errors in setting up the escrow account somehow made GMAC's failure to pay the premium on the Concord Group policy inevitable and/or compelled GMAC to

"force place" other insurance on the property.  Opposition at 40-41.  As Quicken points out,
Quicken Reply at 6-7, this argument is untenable.  James admits that he was asked by GMAC to
provide proof of insurance coverage in the fall of 2005.  Quicken SMF ¶ 17; James Responsive
SMF ¶ Q17.  He asserts that he contacted GMAC on November 4, 2005, regarding the insurance
and "was transferred to Balboa."  James SMF ¶ J49; Quicken's Responsive SMF ¶ J49.  GMAC
did not place insurance for the property until January 26, 2006.  Quicken SMF ¶ 19; James
Responsive SMF ¶ Q19.  James does not suggest that Quicken in any way prevented him from
getting the correct insurance information to GMAC, either directly or through "Balboa."  He
admits that his insurance agent did not send "proof of homeowner's coverage to GMAC" until
March and April, 2008.  James SMF ¶ J59; Quicken Responsive SMF ¶ J59.  The Concord
Group policy was not cancelled until some time after May 20, 2006.  Quicken SMF ¶ 21; James
Responsive SMF ¶ Q21.

Therefore, even if Quicken could be liable under the state and federal statutes on some
theory of setting in motion a series of events that led to GMAC's alleged noncompliance with the
terms of those statutes, the intervening events interrupted any such causal chain and, indeed,
GMAC injured James by charging his account for "force-placed" insurance well before the
Concord Group policy was cancelled, which is the only injury that can reasonably be said to
have followed from Quicken's errors as alleged.[19]  Quicken is entitled to summary judgment on
Count III of the third-party complaint.

---

[19] James alleges in the third-party complaint that Quicken is liable on Count III because GMAC "acted on behalf of
and under the authority of Quicken" in this regard.  Counterclaim ¶ 103.  Assuming *arguendo* that a principal may
be held liable for the acts of an agent with respect to these statutes, James has offered no factual support for this
allegation and does not mention it in his memorandum of law.  Accordingly, the issue is waived.

### c. Count IV

Count IV of the third-party complaint alleges violation of the Maine Unfair Trade Practices Act ("UTPA"). Counterclaim ¶¶ 107-09. Quicken contends that it is entitled to summary judgment on this count because it is entitled to summary judgment on Counts II and III. Quicken Motion at 13. In the alternative, it asserts that its alleged failures to act do not rise to the level of unfair or deceptive activity under the Maine UTPA. *Id*. at 13-15.

James lists the following as the ways in which Quicken allegedly violated the Maine UTPA:

> 1. Quicken provided incorrect disclosures of the total payments, number of payments, amount of payments, and date of payments on the Truth in Lending disclosure. In addition, compared with other documents, they did not provide a clear and conspicuous disclosure that PMI was a required insurance for the loan. Quicken also incorrectly disclosed Mr. James' total monthly payment on the closing documents. Mr. James'[s] correct yearly premium for his insurance at the time was $516 resulting in a payment of $43.00 per month ($516/12). His *correct* total payment, then, was $1307.89 per month. The under-disclosure of the monthly payment amount was a material misrepresentation and omission; making insufficient monthly payments could result in a consumer's loan being placed in default and eventually foreclosure. As such, such an under-disclosure would likely harm consumers who, acting reasonably on the disclosures provided by their lender, would have made insufficient payments to their mortgage[e]. Quicken is liable for such material misrepresentations despite their admission[] that the under-disclosure was a "mistake." . . .

> 2. Quicken . . ., as escrow agent[] for Mr. James, owed him a heightened duty of care. Quicken's failure to obtain accurate insurance information for the escrow account and inform the insurance carrier of the new mortgagee and/or servicer contributed to the mishandling of Mr. James' escrow account by GMAC[.] . . . Mishandling of escrow accounts would also likely cause similar harm to consumers in general. This harm was not reasonably avoidable by consumers as is evidenced by the many attempts made by Mr. James to correct the errors in his account without result. This conduct of mishandling accounts, failing to correct, and placing homeowners in foreclosure is not outweighed by any countervailing benefits to consumers or competition.

Opposition at 42-44 (citations omitted) (emphasis in original).

A "heightened duty of care" is not an element of a claim under the Maine UTPA. None of the case law cited by James in support of these two paragraphs supports his contention that the specific actions and failures to act set forth are either unfair or deceptive within the meaning of those terms as used in the Maine UTPA. *See Campbell v. First Am. Title Ins. Co.*, 644 F.Supp.2d 126, 134-35 (D. Me. 2009) (pricing case); *In re Hannaford Bros. Co. Customer Data Sec. Breach Litig.*, 613 F.Supp.2d 108, 128-31 (D. Me. 2009) (failure to disclose theft of data to customers); *FTC v. Crescent Publ'g Group, Inc.*, 129 F.Supp.2d 311, 321 (S.D.N.Y. 2001) (concealed website charge; New York statute); *Weinschenk*, 868 A.2d at 206 (material misrepresentations to buyers of new houses); *Tungate*, 714 A.2d at 797 (failure to disclose commission on school photographs); *Binette v. Dyer Library Ass'n*, 688 A.2d 898, 906 (Me. 1996) (failure to reveal existence of oil tank to property buyers); Order [on Motions for Summary Judgment], *Brandi Distasio v. Residential Mortgage Services*, Docket No. BCD-WB-CV-09-06, Maine District Court (West Bath), at 6-10 (rejecting claim, not made here, that all residential mortgage transactions are exempt from the Maine UTPA).

In addition, Quicken's errors in setting up the escrow account and overall charges was not material because, in addition to involving small amounts of money ($35.40 over the life of the mortgage and $32 per month for the insurance premium), it was not likely to affect James's, or any consumer's, choice of or conduct regarding a product, which in this case was the mortgage loan. Furthermore, the errors were not hidden; they could be discerned by a careful reading of the closing documents. And, any injury caused by the errors was not likely to be significant, given the sums involved. It was GMAC's independent actions, which, again, James

does not contend were made necessary or inevitable by Quicken's errors, that caused the only substantial injury in this case.

Quicken is entitled to summary judgment on Count IV of the third-party complaint.

### d. Count V

Count V of the third-party complaint alleges negligent and intentional infliction of emotional distress. Counterclaim ¶¶ 110-13. For the reasons set forth in my discussion of this count as to USB and GMAC, section III(A)(3)(e), *supra*, Quicken is entitled to summary judgment on this count as well.

### IV. Conclusion

For the foregoing reasons, the motions for a stay (Docket No. 150) and to amend (Docket No. 122) are **MOOT**. The motion of U.S. Bank National Association and GMAC Mortgage LLC for summary judgment (Docket No. 89) is **GRANTED** as to Counts II and V of the counterclaim and third-party complaint, to USB as to Count IV,[20] and to GMAC as to that portion of Count III of the third-party complaint that alleges failure to correct errors in its handling of his escrow account "despite notification and requests sent to them from Mr. James' counsel," and otherwise **DENIED**. The motion of Quicken Loans Inc. for summary judgment (Docket No. 95) is **GRANTED.**

Dated this 10th day of January, 2011.

/s/ John H. Rich III
John H. Rich III
United States Magistrate Judge

---

[20] USB is no longer a party to Count III of the counterclaim.